**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **A.D., by and through her guardian *ad litem* Judith Serrano, on behalf of herself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 14 C 10106** |
| **CREDIT ONE BANK, N.A.,** | ) ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

A.D., a minor acting through her guardian *ad litem* Judith Serrano, has sued

Credit One Bank, N.A., under the Telephone Consumer Protection Act (TCPA), 47

U.S.C. § 227, on behalf of herself and others similarly situated.  A.D. alleges that Credit

One violated the TCPA by repeatedly calling her on her cellular phone without her

consent, using an automated dialer, ostensibly to collect on a debt she did not owe.

Credit One has moved to dismiss for lack of subject matter jurisdiction under Federal

Rule of Civil Procedure 12(b)(1) on the basis that A.D. and members of the putative

class lack standing to sue.  Credit One has also moved to compel arbitration based on

an arbitration agreement it had with A.D.'s guardian *ad litem*.  A.D. opposes both

motions and has moved for class certification under Rule 23(b)(3).  For the reasons

stated below, the Court denies A.D.'s motion for class certification, denies Credit One's

motion to dismiss, and grants Credit One's motion to compel arbitration and stay

proceedings.

## Background

Credit One is a national bank that provides banking services and credit cards throughout the United States. Judith Serrano, the plaintiff's mother, has been one of its customers since about 2003, when she opened a credit card account with Credit One and began using the card for everyday purchases. A.D., Serrano's daughter, is not an account holder and is not named on her mother's account.

In order to open her account, Serrano signed a standard "Visa / Mastercard Cardholder Agreement, Disclosure Statement and Arbitration Agreement." The agreement provided, among other things, that Serrano consented to receive communications from Credit One:

> **COMMUNICATIONS:** You are providing express written permission authorizing Credit One Bank or its agents to contact you at any phone number (including mobile, cellular / wireless, or similar devices) or email address you provide at anytime [sic], for any lawful purpose. The ways in which we may contact you include live operator, automatic telephone dialing systems (auto-dialer), prerecorded message, text message or email. Phone numbers and email addresses you provide include those you give to us, those from which you contact us or which we obtain through other means. Such lawful purposes include, but are not limited to . . . collection on the Account . . . .

Pl.'s Ex. 2, dkt. no. 78-3, at 6. The agreement also included an arbitration provision, which stated:

> **Agreement to Arbitrate:** You and we agree that either you or we may, without the other's consent, require that any controversy or dispute between you and us (all of which are called "Claims"), be submitted to mandatory, binding arbitration. This arbitration provision is made pursuant to a transaction involving interstate commerce, and shall be governed by, and enforceable under, the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq., and (to the extent State law is applicable), the State law governing this Agreement.

2

**Claims Covered:** Claims subject to arbitration include, but are not limited to, disputes relating to the establishment, terms, treatment, operation, handling, limitations on or termination of your account . . . billing, billing errors, credit reporting, the posting of transactions, payment or credits, or collections matters relating to your account.

*Id.* at 8.  The agreement further provided:

Claims subject to arbitration include not only Claims made directly by you, but also Claims made by anyone connected with you or claiming through you, such as a co-applicant or authorized user of your account, your agent, representative or heirs, or a trustee in bankruptcy.

*Id.*  The Cardholder Agreement defined "authorized user" as anyone the cardholder allows to use her account.  *See id.* at 4.

A.D. filed this suit against Credit One in December 2014 after receiving "at least twelve calls at different times" from Credit One to her cellular phone.  Compl., dkt. no. 1, ¶ 9.  She alleged that these calls were made "using an automatic telephone dialing system," and that she never gave consent to receive such calls.  *Id.* ¶ 8.  A.D. also alleged that "[a]t no time did [she] engage in any transaction with [Credit One] or do business with Credit One in any way."  *Id.*  "Based on the content of the messages left and the conversations with [Credit One's] agents who spoke on the phone," A.D. alleged that "[Credit One] was seeking to collect on a consumer loan extended to another person."  *Id.* ¶ 9.  A.D. did not identify who she thought that other person might have been.

Credit One answered A.D.'s complaint in February 2015.  In its answer, it asserted an affirmative defense in which it "reserve[d] its right to compel arbitration."  Answer, dkt. no. 17, at 14 ¶ 4.  It provided no further explanation.  Credit One moved to stay proceedings in April 2015 to await an anticipated FCC ruling, moved for leave to file a third-party complaint against Serrano in May 2015, and moved to transfer venue in

August 2015.  The Court denied each of these motions, none of which was based upon the asserted affirmative defense that this dispute was subject to arbitration.

During discovery, Credit One reviewed its records and learned that it acquired A.D.'s telephone number when it received a call from that number on November 10, 2010.  The person who called Credit One from that telephone number accessed Serrano's account by giving Serrano's account number and confirming the last four digits of her social security number.  During her deposition in April 2016, A.D. testified that her telephone number is on her mother's family phone service plan and that her mother pays its bills.  She also testified that although her mother has used the phone, the phone belongs to A.D. alone.  According to A.D., the only two people who have ever had access to the phone are she and her mother, but only Serrano knows the last four digits of Serrano's social security number.  Based on this testimony, the only explanation for Credit One acquiring A.D.'s telephone number and determining that it was associated with Serrano's account was that Serrano called Credit One and accessed her account using A.D.'s telephone.

Credit One also learned in A.D.'s and Serrano's depositions in April 2016 that prior to the telephone calls A.D. allegedly received, A.D. enjoyed some benefits of her mother's Credit One account holder status.  Serrano testified that she regularly used the card to purchase food and drink for herself and her daughter.  Serrano also testified that on at least one occasion in early 2014, she preordered drinks from an eatery in her local mall and sent A.D. in with Serrano's Credit One credit card to pay for the drinks.

A.D. and Serrano testified in April 2016, shortly after the close of the first phase of discovery.  A.D. moved for class certification in May 2016, and Credit One responded

and filed motions to dismiss and compel arbitration shortly thereafter.

## Discussion

Credit One moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, asserting that A.D. and the members of the putative class did not suffer a justiciable injury-in-fact sufficient to confer standing to sue as required by Article III of the Constitution. Credit One also moves to compel arbitration and stay or dismiss this case pursuant to the arbitration agreement in the Cardholder Agreement applicable to Serrano's Credit One account. A.D. opposes both motions and moves to certify a class of similarly situated persons who also received autodialed telephone calls without first giving Credit One consent to call them.

## A.    Subject matter jurisdiction

"Article III of the Constitution limits federal judicial power to certain 'cases' and 'controversies,' and the 'irreducible constitutional minimum' of standing contains three elements." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). The first of these three elements is that the plaintiff must have suffered an "'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The injury must also be "fairly traceable to the challenged action of the defendant" and redressable through judicial action. *Id.*

In May 2016, the Supreme Court decided *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). In *Spokeo*, the Court vacated and remanded a Ninth Circuit decision finding that a plaintiff asserted a concrete and particularized injury sufficient to confer

5

constitutional standing where he sued based on a defendant's violation of a consumer protection statute.  Credit One, relying on *Spokeo*, has now moved to dismiss for lack of subject matter jurisdiction on the basis that A.D. has failed to allege a concrete and particularized injury-in-fact.  Pointing out that A.D. seeks only statutory damages and is not seeking any actual damages, Credit One argues that "statutory damage does not, by itself, meet the standing requirements to invoke jurisdiction of the federal courts."  Def.'s Mem., dkt. no. 103, at 7.  Under Credit One's reading, "it is the awarding of statutory damages 'without more' which is now barred by *Spokeo*."  *Id.*

In *Spokeo*, the Supreme Court considered a case in which a plaintiff brought suit to enforce the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681e(b), a consumer protection statute intended to ensure "fair and accurate credit reporting," *id.* § 1681(a)(1).  The defendant, Spokeo Inc., was alleged to be a consumer reporting agency that operated a website through which users could search for information about a person by inputting that person's name, e-mail address, or telephone number.  In response to an online inquiry, Spokeo would search its databases and provide information to the searcher about the search subject, such as his or her address, telephone number, marital status, age, occupation, finances, and education.  The plaintiff, Thomas Robins, sued Spokeo when he learned that the company incorrectly reported that he was married with children, in his fifties, gainfully employed, affluent, and highly educated.  This, Robins claimed, violated the FCRA, which provides that consumer reporting agencies must "follow reasonable procedures to assure maximum possible accuracy" of consumer reports.  15 U.S.C. § 1681e(b).

The district court dismissed Robins's complaint for lack of subject matter

jurisdiction based on the absence of an injury-in-fact sufficient to confer constitutional standing under Article III, but the Ninth Circuit reversed. The court first observed that under Ninth Circuit precedent, "the violation of a statutory right is usually a sufficient injury in fact to confer standing." *Robins v. Spokeo, Inc.*, 742 F.3d 409, 412 (9th Cir. 2014). It then found that Robins had standing to sue because his asserted injury was concrete and particularized, traceable to Spokeo's conduct, and redressable through litigation. Specifically, the appellate court found that Robins's injury was sufficiently concrete and particularized because he alleged that Spokeo "violated *his* statutory rights, not just the statutory rights of other people," and his personal interests in the handling of his credit information [were] individualized rather than collective." *Id.* at 413.

The Supreme Court disapproved of the Ninth Circuit's reasoning. It explained that "concreteness" and "particularization" are distinct concepts and that both most exist for a plaintiff to have standing. The Court observed that the two reasons the Ninth Circuit gave for finding Robins had suffered an injury-in-fact—that his, not just other people's, rights were violated, and that his interests in the handling of his credit information were individualized—demonstrated only that the harm he alleged was particularized. They did not, however, demonstrate that his injury was concrete. The Court explained that "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist. When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" *Spokeo*, 136 S. Ct. at 1548. Because the Ninth Circuit did not consider the extent to which Robins alleged more than a "bare procedural violation," *id.* at 1549, the Court vacated the appellate court's judgment and remanded the case for further proceedings.

*Spokeo* was not the first case to set forth that an injury must be both concrete and particularized to suffice as an injury-in-fact for the purposes of constitutional standing. (That said, it may have been the first case in which the Court opined on the distinction between the two concepts. *See Spokeo*, 136 S. Ct. at 1555 (Ginsburg, J., dissenting) ("The Court's opinion observes that time and again, our decisions have coupled the words 'concrete *and* particularized.' True, but true too, in the four cases cited by the Court, and many others, opinions do not discuss the separate offices of the terms 'concrete' and 'particularized.'") (internal citations omitted)). Indeed, concreteness and particularity have been the twin pillars of a justiciable injury-in-fact for at least forty years. *See, e.g.*, *Duke Power Co. v. Car. Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978) ("Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met."). The Court in *Spokeo* also explained that a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 136 S. Ct. at 1549. But this too was well-settled law. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Lujan*, 504 U.S. at 572.

More importantly, the Court did not find that Robins's asserted injury was not concrete. Rather, the Court simply observed that the Ninth Circuit failed to consider the question adequately. The Supreme Court did not reverse the Ninth Circuit outright; instead, it vacated the appellate court's judgment and remanded the case so the court could more carefully examine whether Robins's asserted harms were concrete.

The Supreme Court in *Spokeo* did, however, set forth a blueprint for evaluating whether an alleged injury is sufficiently concrete to qualify for purposes of the standing inquiry. The Court implied that tangible harms are generally sufficient to constitute a concrete injury, but a justiciable case or controversy can still exist even when the harms the plaintiff alleges are intangible. It cautioned courts that "concrete" is not a synonym for "tangible," for "we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete." *Spokeo*, 136 S. Ct. at 1549 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), and *Church of Lukumi Bablu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993)).

To identify whether an intangible injury is concrete, "both history and the judgment of Congress play important roles." *Spokeo*, 136 S. Ct. at 1549. The Court observed that because the case-or-controversy requirement at the heart of the standing inquiry "is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 1549 (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)). The Court also encouraged courts to defer to some extent to Congress's judgment, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*, 136 S. Ct. at 1549. This is why the Court has recognized Congress's power to "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law" and to "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.* (internal citations and quotation marks omitted). But, the Court

cautioned, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.*

A handful of district courts have, since *Spokeo*, conducted this analysis in similar cases and determined that plaintiffs like Robins lack standing to sue because they do not allege concrete injuries. For example, in *Smith v. Ohio State University*, plaintiffs applying to work for the defendant alleged that the defendant requested consent to pull their credit reports during the hiring process, providing a disclosure and authorization that included extraneous information. *See Smith v. Ohio State Univ.*, No. 2:15 C 3030, 2016 WL 3182675, at *1 (S.D. Ohio June 8, 2016). Plaintiffs sued the defendant under the FCRA, which provides that "a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer unless . . . the consumer has authorized in writing . . . the procurement of the report by that person." 15 U.S.C. § 1681b(b)(2)(A)(ii). The court found that the plaintiffs lacked standing to sue because they had not identified a concrete and particularized injury-in-fact. It noted the Supreme Court's observation in *Spokeo* that "[a] violation of one of the FCRA's procedural requirements may result in no harm," *Spokeo*, 136 S. Ct. at 1540, and it found that this was precisely what had occurred, because the plaintiffs "admitted that they did not suffer a concrete consequential damage as a result of OSU's alleged breach of the FCRA." *Smith*, 2016 WL 3182675, at *4. Likewise, in *Gubala v. Time Warner Cable, Inc.* (cited by Credit One), another district court found that a plaintiff failed to allege a concrete injury where his suit was

based on the defendant's failure to abide by the Cable Communications Policy Act, 47 U.S.C. § 551(e), which required it to destroy records containing his personal information. *See Gubala v. Time Warner Cable, Inc.*, No. 15 C 1078, 2016 WL 3390415, at *1 (E.D. Wis. June 17, 2016).

Like the statute allegedly violated in *Spokeo*, the statutes at issue in these cases imposed record-keeping and procedural obligations on the defendants. The Supreme Court noted in *Spokeo* that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Spokeo*, 136 S. Ct. at 1549 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998), and *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989)). But in other circumstances, a plaintiff would need to show more than the mere violation of a procedural right. Section 1681e(b) of the FCRA, the Court explained, was in the latter group of cases. "[N]ot all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Spokeo*, 136 S. Ct. at 1550.

The Supreme Court's point in *Spokeo* was not that a statutory violation cannot constitute a concrete injury, but rather that where the bare violation of a statute conferring a procedural right could cause a congressionally identified harm or material risk of harm and just as easily could not, it is not sufficient simply to allege that the statute at issue was violated. Failure to ensure the accuracy of a consumer report may result in a harm or material risk of harm the FCRA was intended to curb—loss of

employment opportunities, for example, or a decrease in the consumer's creditworthiness.  But it may also fail to cause any harm or material risk of harm at all.  Put differently, the procedural rights imposed through section 1681e(b) are attenuated enough from the interests Congress identified and sought to protect through the FCRA that charging a defendant with violating them is not necessarily the same as charging the defendant with causing a congressionally-identified concrete injury that gives rise to standing to sue.

The same cannot be said of the TCPA claims asserted in this case.  Unlike the statute at issue in *Spokeo* (and those at issue in *Smith* and *Gubala*), the TCPA section at issue does not require the adoption of procedures to decrease congressionally-identified risks.  Rather, section 227 of the TCPA prohibits making certain kinds of telephonic contact with consumers without first obtaining their consent.  It directly forbids activities that by their nature infringe the privacy-related interests that Congress sought to protect by enacting the TCPA.  There is no gap—there are not some kinds of violations of section 227 that do not result in the harm Congress intended to curb, namely, the receipt of unsolicited telemarketing calls that by their nature invade the privacy and disturb the solitude of their recipients.

In any event, section 227 establishes substantive, not procedural, rights to be free from telemarketing calls consumers have not consented to receive.  Both history and the judgment of Congress suggest that violation of this substantive right is sufficient to constitute a concrete, *de facto* injury.  As other courts have observed, American and English courts have long heard cases in which plaintiffs alleged that defendants affirmatively directed their conduct at plaintiffs to invade their privacy and disturb their

solitude. *See, e.g., Mey v. Got Warranty, Inc.*, No. 5:15 C 101, 2016 WL 3645195, at *3 (N.D.W.V. June 30, 2016) ("[T]he TCPA can be seen as merely liberalizing and codifying the application of [a] common law tort to a particularly intrusive type of unwanted telephone call."); *Caudill v. Wells Fargo Home Mort., Inc.*, No. 5:16-066-DCR, 2016 WL 3820195, at *2 (E.D. Ky. July 11, 2016) ("[The] alleged harms, such as invasion of privacy, have traditionally been regarded as providing a basis for a lawsuit in the United States.").  And Congress enacted the TCPA to protect consumers from the annoyance, irritation, and unwanted nuisance of telemarketing phone calls, granting protection to consumers' identifiable concrete interests in preserving their rights to privacy and seclusion.

Credit One argues that "statutory damage does not, by itself, meet the standing requirements to invoke jurisdiction of the federal courts" and "it is the awarding of statutory damages 'without more' which is now barred by *Spokeo*." Def.'s Mem., dkt. no. 103, at 7.  This argument confuses "damage" with "harm" or "injury."  Damages are legal remedies for harms or injuries suffered, they are not the harms or injuries themselves.  *Spokeo* does not stand for the proposition that a plaintiff lacks standing to sue if she foregoes her right to seek actual damages and seeks only statutory damages. Rather, it stands for the proposition that a plaintiff lacks standing to sue if she has not suffered a factual, real-world *injury* in the form of a concrete and particularized harm. Congress has recognized that although it might be difficult to monetize, a consumer suffers a concrete though intangible injury when she is subjected to an autodialed non-emergency phone call without having given prior express consent.  The consumer can quantify the extent of her injury by seeking actual damages, or she can simply request

damages in the set amount provided by Congress in the TCPA.  A.D. has chosen the latter route; doing so does not divest her of standing to sue.

Credit One cites a recent decision by a judge in the Eastern District of Louisiana who found no concrete injury where the named plaintiff alleged he received unsolicited fax advertisements from the defendants in violation of section 227.  *See Sartin v. EKF Diagnostics, Inc.*, No. 16 C 1816, 2016 WL 3598297, at *3–4 (E.D. La. July 5, 2016). There, the court found that the plaintiff failed to allege a concrete injury-in-fact where he alleged only that he and the class he purported to represent "sustain[ed] statutory damages, in addition to actual damages, including but not limited to those contemplated by Congress and the Federal Communications Commission."  *Id.* at *3 (internal quotation marks omitted).  The plaintiff responded to the defendants' motion to dismiss by stating that he was injured by having to waste valuable time as a result of the fax, but the court refused to acknowledge the plaintiff's argument because that injury was not stated in the complaint.  Because "[t]he well-pleaded factual allegations in the complaint establish nothing more than a bare violation of the TCPA, divorced from any concrete harm to [the plaintiff]," the court found he "failed to demonstrate a judicially-cognizable injury in fact" and dismissed his case for lack of subject matter jurisdiction.  *Id.* at *4.

The Court respectfully disagrees with the reasoning of the judge in *Sartin.*  In contrast to statutes that impose obligations regarding how one manages data, keeps records, or verifies information, section 227 of the TCPA directly prohibits a person from taking actions directed at consumers who will be touched by that person's conduct.  It does not matter whether a plaintiff lacks additional tangible harms like wasted time, actual annoyance, and financial losses.  Congress has identified that unsolicited

telephonic contact constitutes an intangible, concrete harm, and A.D. has alleged such concrete harms that she herself suffered. It would be redundant to require a plaintiff to allege that her privacy and solitude were breached by a defendant's violation of section 227, because Congress has provided legislatively that a violation of section 227 is an invasion of the call recipient's privacy.

Finally, Credit One argues on reply that A.D. lacks standing because she has not adduced evidence of injuries she suffered and because she did not discuss the traceability element of constitutional standing in her response brief. The Court notes that A.D. has no responsibility to adduce evidence to prove her claims in response to a motion to dismiss and that the subject of Credit One's three-and-a-half page argument in its motion to dismiss was whether A.D. alleged a concrete injury, not whether the injury was traceable to Credit One's conduct. In any event, the Court disagrees with Credit One's argument that evidence shows that it was Serrano's act of calling Credit One on her daughter's phone that caused the injury alleged. A.D. alleges that she received an autodialed debt collection call from Credit One without giving consent. Whether or not her mother did something to authorize Credit One to make the call, the injury that A.D. alleges is directly traceable to Credit One's act of calling (or having a call made on its behalf to) A.D.'s phone.

In sum, A.D. has identified a concrete injury-in-fact that she herself suffered, and she has alleged that the injury is fairly traceable to Credit One's conduct and is judicially redressable. For these reasons, A.D. has standing, and the Court may exercise subject matter jurisdiction over her case. The Court therefore denies Credit One's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

**B.     Motion to compel arbitration**

Credit One has also moved to compel arbitration and stay or dismiss this action based on the arbitration clause in Serrano's Cardholder Agreement.  A.D. argues that Credit One's motion is untimely.  As noted above, A.D. filed this lawsuit in December 2014.  Credit One answered the complaint, moved to stay the case pending an FCC ruling that would allegedly impact this dispute, and moved to transfer venue, but it did not move to compel arbitration until June 2016.  A.D. argues that Credit One has no plausible explanation for the eighteen-month delay between the date the complaint was filed and the date Credit One sought to compel arbitration, and that the Court should therefore deny the motion and allow her case to proceed.

As an initial matter, Credit One argues that because "Ms. Serrano's Cardholder Agreement provides that Nevada law applies," Nevada's waiver rules govern this case.  Def.'s Mem., dkt. no. 106, at 7.  But the Cardholder Agreement does not so provide.  In truth, the agreement states that it "is made pursuant to a transaction involving interstate commerce, and shall be governed by, and enforceable under, the Federal Arbitration Act (the 'FAA'), 9 U.S.C. § 1 et seq., and (to the extent State law is applicable), the State law governing this Agreement."  Pl.'s Ex. 2, dkt. no. 78-3, at 8.  Credit One offers no authority for the proposition that Nevada law should govern the particular question of whether the contractual right to arbitrate has been waived, and the Court sees no reason it should not rely on federal rules of decision on this issue, especially in light of the "long line of cases show[ing] that the FAA preempts inconsistent state law."  *Renard v. Ameriprise Fin. Servs., Inc.*, 778 F.3d 563, 566–67 (7th Cir. 2015).

"A party may waive a contractual right to arbitrate expressly or implicitly."  *Halim*

*v. Great Gatsby's Auction Gallery*, 516 F.3d 557, 562 (7th Cir. 2008) (citation omitted). A court seeking to determine whether a party has waived arbitration must "examine the totality of the circumstances and determine whether . . . the party . . . has acted inconsistently with the right to arbitrate." *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citation omitted). "Although several factors may be considered in determining waiver, diligence or the lack thereof should weigh heavily in the decision—did that party do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration?" *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 756 (7th Cir. 2002) (emphasis and internal quotation marks omitted).

A.D. contends that Credit One waived its right to arbitrate because it filed "substantive" motions prior to moving to compel arbitration. As A.D. points out, "a litigant cannot attempt to prevail in court, then seek arbitration only as a fallback." *Cent. Ill. Carpenters Health & Welfare Trust Fund v. Con-Tech Carpentry, LLC*, 806 F.3d 935, 937 (7th Cir. 2015). There is some truth to A.D.'s contention. Credit One's request to stay the case pending an anticipated FCC ruling on a contested legal issue and its request to transfer the case to another federal district both implied that it was looking for a judicial decision in the case rather than a decision by an arbitrator

The record reflects, however, that Credit One did not have a viable basis to seek arbitration of A.D.'s claims until quite recently. Of course, "lengthy delay" itself "can lead to an implicit waiver of arbitration." *See Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002). This is especially true where the delay was due purely to the defendant's lack of diligence. *Ernst & Young*, 304 F.3d at 756. A.D. argues that the

docket is replete with evidence of Credit One's delinquency in determining whether it had a contractual right to arbitrate. She points out that Credit One knew at least as early as February 2015 that it might have a right to arbitrate, as evidenced by the fact that it asserted in its answer to the complaint a reservation of the potential right to seek an order compelling arbitration. A.D. contends that this fact undermines Credit One's assertion that it did not know it had a right to arbitrate until recently. She also argues that even if Credit One indeed did not know it had the right to arbitrate until recently, there is no reason it should have taken this long. A.D. points out that Credit One's investigation of its records took minimal time and effort, but did not even begin until over a year after her lawsuit was filed. She also points out that it is implausible that Credit One could not have foreseen that depositions would reveal that a mother and her minor daughter sometimes use the same phone and sometimes enjoy goods and services purchased by use of the mother's credit card.

These arguments are not persuasive, at least not on the record before the Court. First, the mere inclusion of a reservation of the right to seek arbitration in Credit One's answer is not an indication that it long ago knew or should have known that it had a contractual right to arbitrate claims by A.D., a non-cardholder. Aside from the caption and introduction, which stated that A.D. was bringing suit "by and through her guardian *ad litem* Judith Serrano," Compl., dkt. no. 1, at 1, A.D.'s complaint nowhere referenced the fact that she had used a Credit One credit card or had allowed her mother to use her cellular phone to make a call concerning the account; in fact, A.D. indicated she had done no business whatsoever with Credit One. All told, the complaint contained nothing that would have given Credit One a basis to demand arbitration. Its reservation of the

right to seek arbitration later does not signal that it knew it had viable grounds to do so at the time.

Second, Credit One's investigation into its records could have been conducted earlier, but it would have revealed only that Credit One obtained A.D.'s number when the phone was used to call the company to check Serrano's account. It would not have revealed whether A.D. had ever used the credit card, whether it was A.D. or her mother who called, or whether the company could otherwise demonstrate that A.D. should be bound to the terms of the arbitration agreement her mother signed. Credit One did not learn what it needed to know to support its motion to compel arbitration until it took A.D. and Serrano's depositions in April 2016 and learned the extent to which A.D. was connected to her mother's Credit One account. Credit One filed its motion promptly after taking those depositions. On the record before the Court, Credit One was reasonably diligent and has not waived its right to arbitrate.

A.D. does not appear to dispute that had Serrano sued Credit One under the TCPA for autodialing her to collect on a debt without prior express consent, her claim would be subject to arbitration. The arbitration clause contained in the Cardholder Agreement is extremely broad and expressly covers all claims concerning "collections matters" and "communications relating to [the cardholder's] account." But Serrano has not brought suit—A.D. has. Credit One acknowledges that A.D. is not a cardholder or a named account holder with Credit One and that A.D. has never signed any agreement to do business with Credit One, much less an agreement that includes an arbitration provision. It argues, however, that A.D. must arbitrate her TCPA claims because A.D. is an "authorized user" of her mother's credit card who should be bound to the terms of the

contract Serrano signed.

Generally speaking, a non-party to an arbitration agreement cannot be forced to arbitrate, for "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). The Seventh Circuit has long recognized, however, that "there are five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing *Fyrnetics (H.K.) Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023, 1029 (7th Cir. 2002)).

Credit One contends that the doctrine of estoppel applies in this case. Under this doctrine, "a nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." *Zurich Am.*, 417 F.3d at 688. Credit One points out that during their depositions, A.D. and Serrano revealed that A.D. used her mother's credit card on at least one occasion and allowed her mother to use her cell phone to call Credit One to make an inquiry about her account. Credit One argues that this makes A.D. an "Authorized User" under the Cardholder Agreement and a direct beneficiary of the contract. It contends that she is essentially seeking to enjoy the benefits of her mother's contract (by using the card and allowing the cardholder to inquire about the account using her telephone) but avoid the same contract's arbitration provision.

A.D. disagrees. She contends that she cannot be considered a beneficiary of the contract or an "Authorized User" because she never "used" the credit card or sought to

enjoy the benefits of the contract in question. She does not deny that she brought the credit card into an eatery and made a purchase with the card on at least one occasion, nor does she deny that she allowed Serrano to use her phone to call Credit One about the card's account. She contends, however, that paying for food or drink for herself and her mother with her mother's card does not make her a "user" of the card and does not amount to invoking the Cardholder Agreement's benefits. A.D. says that this is "exactly what happens at a restaurant when a diner pays using a card. The card is handed to the server, who takes the card to the point of sale device and runs the charge, returning with the card and a receipt for signature." Pl.'s Resp., dkt. no. 113, at 9. She argues that she merely "transported the card" to the eatery's "point of sale device" and returned with pre-ordered beverages. "If [A.D.] is an authorized user," she says, "then so is each and every waiter, cashier, toll booth attendant, and department store clerk in the United States who handle[s] countless cards for customers on a daily basis and physically process[es] financial transactions." *Id.*

This argument is utterly lacking in merit. A.D. is nothing like a waiter, cashier, attendant, or department store clerk. A cashier who is handed a credit card to pay for a purchase acts as an agent of the payee. The cashier in no way represents that he or she is authorized to pay for goods or services with the card. Conversely, when A.D. walked into an eatery with a credit card to pay for a purchase, she represented to the payee that she was authorized to use the card she handed them. There is a fundamental and material difference between a person who acts on behalf of a payee to run a credit card and demand payment from the credit card company for a purchase and a payor who represents that the credit card company will pay for a purchase on the

payor's behalf.

When a consumer hands a credit card to a vendor (or a vendor's cashier), she is in effect representing to the vendor that the credit card company is contractually obligated to transfer funds to the vendor to cover the cost of the goods sold or services rendered. A.D. did exactly that: she asked a vendor to provide her with goods without requiring her to tender payment, based on her representation that Credit One was contractually obligated to tender payment on her behalf. The only reason she was able to do this was that the Cardholder Agreement Serrano signed permits her to authorize her daughter to use the card. A.D. therefore derived benefit from the contract containing the arbitration agreement.

The doctrine of estoppel exists in this context "to prevent a litigant from unfairly receiving the benefit of a contract while at the same time repudiating what it believes to be a disadvantage in the contract, namely the contractual arbitration provision." *Gersten v. Intrinsic Techs., LLP*, 442 F. Supp. 2d 573, 579 (N.D. Ill. 2006) (citing *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999)). That is precisely what A.D. is attempting to do. The Cardholder Agreement allowed her to represent that Credit One would pay for a purchase she made. It also requires the cardholder and any authorized user to arbitrate any claims arising out of communications Credit One makes and collections activities it engages in concerning the account. A.D. is bound to the terms of the Cardholder Agreement, and Credit One has a contractual right to arbitrate this dispute. The Court therefore grants Credit One's motion to compel arbitration. Rather than dismiss the case, the Court will stay proceedings and compel arbitration. *See Halim*, 516 F.3d at 561.

The arbitration agreement applicable to this dispute also provides that "[i]f you or we require arbitration of a particular Claim, neither you, we, nor any other person may pursue the Claim in litigation, whether as a class action, private attorney general action, other representative action or otherwise." Pl.'s Ex. 2, dkt. no. 78-3, at 8. It further provides that "no class action, private attorney general action or other representative action may be pursued in arbitration, nor may such action be pursued in court if any party has elected arbitration." *Id.* at 9. In light of these provisions, the Court denies A.D.'s motion for class certification.

## Conclusion

For the foregoing reasons, the Court denies Credit One's motion to dismiss for lack of subject matter jurisdiction [dkt. no. 102] but grants its motion to compel arbitration [dkt. no. 105]. In light of the class action waiver contained in the user agreement that binds A.D., the Court denies A.D.'s motion for class certification [dkt. no. 78]. This case is accordingly stayed pending the outcome of arbitration, and the case will be administratively terminated in the interim. A joint status report regarding the status of arbitration proceedings is to be filed as of February 28, 2017.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 19, 2016